We're on our first case. We'll hear Board-Tech v. Eaton. Good morning. Good morning, Your Honor. May it please the Court, Alex Pilmer on behalf of Appellant Board-Tech Electronic Co. The first issue I'd like to address is whether Board-Tech provided for fair notice of its claim under the second amended complaint. And the plain allegations of the complaint consist of three primary facts. First, that the defendant, Eaton, manufactures and sells three series of general-use snap light switches. Next, that Eaton advertises to its consumers that these light switches comply with UL 20 standards. And third, that in fact those switches do not comply with the UL 20 standards. Which specific switches are we talking about? And are those alleged in the last complaint, the amended complaint? Yes, Your Honor. And I would direct your attention to Exhibit A to the second amended complaint. That's at Appendix 96 through 99. And there are three sets of switches there. That is the 7500 series. There are eight 7500s. Each one of those series, as I understand, contains over 100 switches. Is that correct? No. I would say- What's wrong about that? So if you take a look at the 7500 series, there are eight switches in there. 7501, 7501-9, and it goes on from there. If you count- A total of 30 switches? A total of 30 switches for the three series? Between the 75, 76, and 7700, yes, there are a total of 30 different switches. And which switches did BORTEC test? So we did not specifically allege that. What we did allege is that we tested eight sets of switches, at least one set from each of the three series. But yet the- Go ahead. Not in compliance with the certification mark. We did. And I would submit, Your Honor, that testing of a sample, especially in connection with a pleading, is an acceptable method that's been approved by this court and by district courts within this circuit. I would direct your attention to the FHFA versus Nomura case, for example, where it involved residential mortgage-backed securities. And at trial, the district court relied on sampling of loans that were, in fact, quite different from each other. How many different switches did you test? I mean, there were eight sets of six switches. Were they six different switches? There were four different switches. Some of the sets were subjected to multiple rounds of testing. So you only tested four switches, but yet you're alleging that 30 switches aren't effective. I am, Your Honor. And the reason why I believe that's appropriate in this context is if you look at Exhibit A, Appendix 96, you'll see that the product description and the design features for the 7500 series are exactly the same for all of the switches in that series. And that's also true for the 7600 series and the 7700 series. The district court wanted BORTEC to specify which switches it tested, and it just wouldn't do that. Why is that? Why wouldn't it identify which switches were tested? I would submit, Your Honor, that it's not. If I'm allowed to extrapolate from a sample, then whether— My question is why would BORTEC not identify the specific switches that were tested? Well, first, we didn't actually have a hearing on this motion. We had a— No, no, no. Could you just answer that question, why? The third time. Yes. The why is we did not think it was necessary to do, but we could. And if we had been given leave to amend, we could have identified those switches. But we did not think it was necessary to do so, and that's why we didn't. Okay. So when you—I'm sorry. When you were asked by Judge Forrest to provide—obviously, she identified for you. She was trying to help you. She identified what she perceived to be a defect in the allegations. And so you were aware that that was a perceived defect in the complaint. Did you have the information about which specific switches were defective? I'm sorry, I didn't hear the question. Did you have the information then about which specific switches were defective? Yes, we did, Your Honor. The conversation that we had with the district court was about identifying the specific accused switches. And so the amendment that we provided in the second amended complaint was to identify specifically which switches we were accusing. Not necessarily which switches we had tested, but which ones that we had accused. And that's what the conversation was with Judge Forrest, and that's why Exhibit A was added to the second amended complaint. Could you have provided an incident report to UL in this case about the failures? Did we? Could you have? I suppose we could have, yes. And you didn't do that. We did not. Why not? Because that's not the claim that we're bringing, and it's not required under the law. We are bringing a claim for false advertising under the Lanham Act, and all we are required to demonstrate and prove is that we have met the elements of the Lanham Act claim. What are the words that constitute the false advertising? The words are the use of the UL label. And then I would also point out that in paragraph 38 of our complaint, one of the product descriptions of the one of the products says that the switch is listed to UL 20. It is rated for motor loads per UL 20. It withstands 1,500 volts per UL 20. Those are among the. . . Suppose you had raised this issue with Underwriters Laboratory. They had retested, and Underwriters Laboratory concluded that the Eaton products deserved to carry the UL 20 in premature. Would you still have a claim? Yes, Your Honor, because when the defendant puts the product into stream of commerce, it is making a representation that the products it is actually selling comply with the UL 20 standard. Or it is certifying that Underwriters Laboratories certifies it. It is also doing that. But Underwriters Laboratory does certify it. Underwriters Laboratory has provided permission to use the mark. That is true. Well, if a toaster is approved with the good housekeeping seal of approval, can a rival toaster company say it doesn't deserve that, and therefore it is false advertising, because actually it is extremely inconvenient, sloppy, and poor? Under that circumstance, I don't think so, Your Honor. Why not? Because I don't think there is a precise set of specifications that we are talking about. Here there are very precise specifications that the switches are required to meet in order to pass UL 20. These are objective criteria that are published. And, in fact, when tested in the market, these switches do not comply. What if you tested yours and you found that yours met the requirements, but you didn't submit them to Underwriters Laboratory? Could you put down complies with UL 20? I don't believe so, Your Honor. Why not? Because I don't believe I would have permission to use the UL 20 mark in that circumstance. Why isn't this entirely UL's authority to determine whether a mark is appropriate, whether a product complies in this case? I think this brings us right within the ambit of the Palm Wonderful case, the United States Supreme Court, where they addressed a similar issue with labeling between FDCA-approved label and the Lanham Act. The court held it's really a matter of statutory interpretation, not preemption, and looked at the two statutes and compared them to determine whether or not there was an express intent by Congress to supplant one remedy or the other. In that case, the Supreme Court held that, in fact, a Lanham Act claim was appropriate in that circumstance. Here, I would suggest the same analysis should be done. The text of the Lanham Act allows for a false advertising claim to be brought by my client in this context. The certification mark statute that the defendants have cited and the district court relied upon, which is 15 U.S.C. section 1064-5, allows for a petition to cancel a certification mark on the ground that the registrant, and that would be UL, does not control the use of the mark. That's an action against the registrant. That's not an action against the false advertising. Those two statutes complement each other. They are not inconsistent with each other. You said that the false advertising consists of the use of the UL-20 imprimatur, and one product has advertising that said it is rated per UL-20. When you say one product, do you mean one product line or one switch? What I quoted to you from was the catalog that's for the 7600 series. It's the entire series of products, which is exactly why we have tested samples from that series. The description is identical for each of those, which is why I believe extrapolation from testing a sample from one series is appropriate for the remainder of the series. You've reserved rebuttal? I did, Your Honor. Is there some new area you want to go into? The only other point I would like to make is on whether or not we should have been given leave to amend in this circumstance. We believe we have appropriately alleged the claims that we've brought. The potential reasons typically used to deny leave to amend are not present here. Amendment would not be futile. You did not ask for leave to amend, and I understand that your argument is that you didn't have an opportunity, but what you could have done is taken the precautionary step of saying we would like leave to amend in the event that you rule against us. You didn't do that either. We did not do that, Your Honor. I agree. You had three bites at the apple. I would dispute whether we had three bites at the apple, Your Honor. We filed an original complaint. The court said that without ruling on any motion, without reading any pleadings, if you want to amend, you should amend. You had the benefit of there at least what they contended were deficiencies in your complaint, and then you did take the opportunity to submit a First Amendment complaint, and then you submitted a Second Amendment complaint. We did, yes. That sounds like three bites at the apple. The one issue that the district courts relied upon that we did not have the ability to amend was on the identification of which switches we actually tested. It was not really part of the discussion leading up to that, and I would submit given that this case was barely a few months old, no discovery had been taken, there's no prejudice, there's been no delay, that if that, in fact, was an important consideration, that we should be given leave to amend to at least identify the switches. The single product that you said, the 7600 series, that says the product is rated per UL 20, why can't that be read to say that it's rated by UL per UL 20, and it is rated by Underwriters Laboratory? It is. That is true that it is rated by Underwriters Laboratory, but this is a separate statement. This is a statement that says it's rated per those standards, meaning that it meets those standards, and that's separate from action. But who's rated it? Underwriters Laboratory has rated it. That is true, Your Honor. Underwriters Laboratory has rated it. And that's also true. All right. So what's not true? Well, I'm agreeing with what you're saying is true. What I'm saying is there's another step here, which is that the manufacturer, when it puts the product into the stream of commerce, is also saying this product, this light switch, actually complies with UL 20 standards, and they, in fact, do not comply with UL 20 standards. Thank you. Thank you, Your Honor. We'll hear you on the rebuttal. May it please the Court. Saren Turner of Latham & Watkins for Defendant Appellee. Let me jump right to the sampling point because the problem with the sampling argument here is that the sample products have to be materially similar to the products they're extrapolating to. They have not alleged anything in that regard in the complaint. And what they point to today, Your Honor, in the appendix, they're completely wrong about what it says. If you look at the product description, it does not say, I'm at appendix 96. The other pages are similar. But if you look at appendix 96, the product description says single pole, three-way, four-way. Those are three different types of switches, fundamentally different. And if you look down at the individual listings in the table below, you see some are single pole, some are three-way, some are four-way. These are not identical switches. There's no basis from looking at this to assume that all of these switches were performed the same way on any particular UL test. If Broad Tech had, instead of sampling or instead of alleging that they had merely sampled some of the switches within each of the three series, they had alleged that they had tested every single one of those switches in those three series, and all of those failed to meet the compliance standards, would that have been enough? There wouldn't have been the same Rule 8A Twombly problem. So what would have been the remaining problem? Well, there's still the issue of whether they've satisfactorily alleged falsity. Okay. So really, the Rule 8A issue relates entirely to the sampling and to the sample size? What if they had said we tested 90 percent? And you see where I'm going. It's not a matter of percentage, Your Honor. Percentage assumes you're looking at apples and apples. You can't just take, you know, let's go to Campbell's Soup and take, you know, some flavors of Campbell's Soup off the shelf. I'm not going to tell you what they are, but I'm going to tell you that I tested some of them, and some of them were not low-fat, even though they said low-fat. So I'm going to bring a claim alleging that all of the Campbell's Soup flavors are not low-fat. You can't do that. You have to. There could be, you know, some are cream, some are puree, some are broth-based. That's what I'm asking is when is enough enough, right, by way of the sample? Are you saying sampling per se is never sufficient? No. I think what you'd have to have is you have to have a sample, and then you have to have an explanation of why the sample is materially similar to the broader set you're extrapolating to. It's that simple. And they haven't done anything like that here. If you look at some of the cases we've cited, like the Frito-Lay case from Northern District of California, very similar move that the plaintiff did there. They identified five specific snack products, alleged how they were falsely advertised, and then they appended 85 additional products to their complaint, and they said these all raised the same issues. The court says that's not enough. You have to explain. It's not sufficient that they're all snack products manufactured by the same manufacturer. It's the same thing. So your buyer's guide advertises that the switches share identical design features and product descriptions. Is that right? Again, no, Your Honor. The product description here does not indicate anything about them being identical. It's listing different types of switches within this series. These are a collection of switches within a much broader series, by the way. These are not all the 7,500 series. The buyer's guide does not advertise the identity of these switches in terms of design features and so on. I'm saying there's nothing that can be assumed about the identical construction of these switches just based on the fact that they're within some same series for marketing purposes in a catalog. How many switches, individual switches, are there that bear the imprimatur UL 20 marketed by your client? That bear the UL mark? That's right. There are hundreds, many hundreds. So your view is that your adversary would have to file a very long complaint. Correct. And that's what they tried to do in their first complaint, actually. They alleged we tested defendant switches. They didn't even say anything about how many. And then they alleged that all of defendant switches are non-UL compliant. Yeah, but let's pass beyond that because, as Judge Chin has pointed out, we're on the third iteration. I do think it's telling, Your Honor, because I think the reason they've been so cagey about not revealing which they've tested is because they want to use thinly-plaid allegations to pry open the door very wide to discovery and get access to our intellectual property, get access to our records, see if anything damaging turns up. That's exactly the sort of discovery abuse that Twombly was designed to prevent. Does Underwriters Laboratory have all that information, stuff that would be proprietary? Yes, they have access to it. They have access to it because they need it for their certification. Under the follow-up inspection regime, yes, they have continuing access to all of this information. And that goes to why they did . . . . . . presumably have been testing them all that time. If they've been finding problems with our switches, you would think they would go to UL and raise that issue with UL and get confirmation. Well, not necessarily because your adversary said if he did it and UL said, no, they comply, he would still have his claim. Well, precisely. And that's exactly what's wrong with the merit side of their claim is they want to step in the shoes of UL and say, it doesn't matter what UL thinks. We don't think the UL label should be put on your products. And our testing . . . If your adversary were to advertise that your client's switches do not comply with Underwriters Laboratory 20, would that be false advertising? I'm sorry, if . . . If your adversary, if your competitor were to advertise that your switches, some or all of them, do not comply with the standards, with the UL 20 standard, would that be false advertising? I think if they said it in any way that indicated that UL was wrong in concluding so . . . Wouldn't that be the implication? Yes. I mean, so it's conceivable. I think the point is . . . Conceivable what? That they can advertise it or that they could do it? What is true is that UL has tested and approved these products. I didn't really ask you that. I said, if they would advertise that your client's switches don't conform to the UL 20, they don't perform up to the standard that UL 20 requires, would that be false advertising? I guess it would depend on context. If they were saying that we tested and our test results show . . . Let's just take the context of just saying it. Just saying it? Well, that's what makes it difficult. I would argue that, yes, there's a potential false advertising claim there because it implicates UL's determination. UL is the owner of the mark. UL gets to decide who bears the mark, and it's based on their testing under UL 20 standards. UL could be wrong, but that doesn't really matter. So long as UL determines that a product is in compliance, that's enough. That's the end of the story. UL is the ultimate arbiter here. What is UL certifying? UL is certifying that they've tested the product according to the relevant UL standards and found that the standards are met. A representative sample. Correct. It signifies that representative samplings of those products have complied with the testing required under UL's compliance program. Is that right? Yes. It's that simple? Yes. So, Your Honor, there were also some, in terms of the arguments that counsel made about leave to amend, the Second Circuit has been very clear there's no abuse of discretion where leave to amend wasn't sought. They did have the opportunity to leave to amend here, as they did. They amended three times. After we originally brought our complaint and the judge issued her order saying, you know, go ahead and amend if you're going to amend, they amended once. They amended twice. They amended twice. I'm sorry, Your Honor. They amended twice, but they also had a third opportunity to request leave to amend in their opposition papers as an alternative argument. We would have opposed it. Actually, that would have probably been in the reply at that point. I'm not even sure. But in any event, if we had opposed it, they still would have had the opportunity to ask for it, and they didn't. And so there's no abuse of discretion here, and that is the standard. The district court was not spontaneously required to give them another chance. And as she indicated in her ruling, she was genuinely concerned that this issue had been squarely raised from the outset in our opposition papers by the judge at the initial status conference. And for strategic reasons, apparently, they chose not to disclose this information. This was the first time today that I heard that it was only four products that were actually tested. That itself is a significant piece of information that I would have liked to have known. Unless, Your Honor, I see my time is almost up. Unless Your Honors have additional questions, I can rest. Thank you. Any rebuttal? I appreciate the opportunity to respond. On the issue of what the representation is from when the manufacturer uses the UL mark, I would point to a quote that we included in the complaint at paragraph 31 from UL itself. And that reads, quote, the presence of the UL certification mark is the product manufacturer's representation that a product meets all applicable requirements. So when Eaton sells these light switches, they are representing to the public that the light switches comply with all the applicable requirements. This is another extra level, I think. It's actually, I think, representing the UL has determined that these switches comply. That's not actually what it says, Your Honor. It's the product manufacturer's representation that the product meets the applicable requirements. Not that UL has certified that, but that the product manufacturer is representing when it uses the mark that the product actually meets. Isn't the fair meaning of that? That the manufacturer has submitted a fair sampling and that UL has issued its certification? I don't think so, Your Honor. Your Honor, I think the fair meaning of it is that exactly what it says, that the product manufacturer is making a representation that the product meets all applicable requirements. On the sampling point, the question posed by counsel for Eaton was, are the products materially similar in order to extrapolate from the sampling? I would submit that if you actually look at this product guide, that it is more than plausible on the pleading stage to conclude that these products are materially similar when they are grouped together by the manufacturer, listed with the same product description, listed with the same design features. I referenced earlier at paragraph 38 of the complaint, again, taken straight from the product materials from Eaton for the 7600 series. All of the specifications for the 7600 series are listed together by the defendant and are advertised as the specifications for all of the 7600 series. So I would submit that, in fact, the products are materially similar, such that it is appropriate to extrapolate from the sample. Thank you. And that's consistent with their own advertising. Exactly. Thank you. Thank you. Thank you, Your Honor. We reserve decision.